## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ABIODUN A.,

|  |  |  |
|---|---|---|
| | Plaintiff, | Case No. 20-cv-698 |
| | v. | |
| KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, | | Judge John Robert Blakey |
| | Defendant. | |

## MEMORANDUM OPINION AND ORDER

In this social security appeal Plaintiff Abiodun A. asks the Court to reverse the Commissioner's decision to deny her claim for Disability Insurance Benefits (DIB), *see* [1], [15]. The Commissioner seeks summary judgment affirming her decision. *See* [20]. For the reasons explained below, the Court grants the Commissioner's motion [20], affirms the decision to deny benefits, and denies Plaintiff's request for reversal.

## I.    Factual Background & Procedural History[1]

Plaintiff, born December 24, 1966, filed an initial claim for disability on February 18, 2014, alleging that she became disabled as of May 1, 2013 due to FMND brain disease, high blood pressure, pain, fatigue, and headaches. *See* [10-2] at 17. The Social Security Administration (SSA) denied her claim initially on May 14, 2014, *id.* at 23, and on reconsideration on December 11, 2014, *id.* at 31–32. Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and the case was

---

[1] This Court draws all facts from the Certified Administrative Record [10].

assigned to ALJ Edward Studzinski, who held the requested hearing on June 20, 2016. Plaintiff, represented by counsel, attended and testified.

Plaintiff testified that she had to stop working in January of 2013 because of severe headaches, fatigue, and weakness. [10-1] at 60. She testified that she experiences severe headaches (rated at a 10/10 for pain) three or four times a week, each lasting almost all day. *Id.* at 65. She testified that when she takes her medication, the pain goes to about a 5/10. *Id.* She testified that when she has a headache, she cannot function. *Id.* at 66. She further testified that she spends about 12 hours a day sleeping, including nighttime sleeping. *Id.* at 81. The ALJ indicated from the outset that he did not believe Plaintiff's allegations found support in the record, and he pressed Plaintiff and her attorney to show him what in Plaintiff's medical records or clinical history would support her claims concerning the severity and extent of her limitations. *Id.* at 60–63, 67–68, 71–72. The ALJ advised that, although Plaintiff was clearly impaired, he did not see anything in the record to establish incapacitating, disabling severity, given all the factors, and he pointedly asked Plaintiff and her counsel to identify anything in the record to support her claim:

> so if someone's going to tell me that three days a week they are unable to do anything for the entire day due to their headaches with overlying fatigue, then I have to ask myself, gee, why is there no indication that they ever mentioned this severity, this frequency, to their doctors or if they did, why did the doctor never mention that in the record. If they're experiencing this, they're incapacitated for three days a week – as your client testified – why did they go seven months without getting any treatment? Why did they then get treatment only – I saw three visits throughout January 2015. Maybe there's a really good reason for that. How are they able to travel to Nigeria – and back? And I understand that's not substantial gainful activity, but that's some activity. So those are the concerns I have.

*Id.* at 72–73.

Plaintiff could not respond to this line of questioning or point to anything to document the claimed severity and frequency of her headaches or the resulting limitations. Indeed, with regard to restrictions, Plaintiff testified that her doctor told her that she should not lift anything above ten pounds, she should "take it easy" and not stress herself, she should avoid turning her neck all of a sudden. *Id.* at 77.

At the hearing, the ALJ also heard from Aimee Mowery, a vocational expert (VE). The ALJ gave the VE a lengthy, detailed hypothetical and asked if the hypothetical person could perform Plaintiff's past work:

> please consider an individual of the claimant's age, education, and work experience, who's capable of light level work as defined within the regulations. They can lift 20 pounds occasionally; 10 pounds frequently, There are no limitations on the total ability to sit, stand, and walk throughout an eight-hour workday; however, they must adjust their position at least once every hour for five minutes. So if they're on their feet standing and walking for – excuse me, five minutes every 60 minutes. If they're on their feet standing and walking for one hour, they must then sit for five minutes before standing and walking for another 60. Opposite's true, if they're sitting for 60 minutes, they must be allowed to – well, no, there's no limitation on sitting. So there's unlimited sitting. There's no expectation that the individual would need to be off task or abandon their workstation while doing this alternation. So I'm looking for jobs that either have a workstation that would accommodate five minutes of standing – of sitting every hour or that have tasks – five minutes' worth of tasks that could be performed while seated each hour or if you wish to testify whether five minutes sitting every hour would be acceptable off task behavior.

> And if the job involves five minutes' worth of activities throughout every hour, periodically, then there's no need for a single five-minute period at the end of each hour.

> There are postural limitations. No climbing of ladders, ropes, and scaffolds; no climbing – no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling. I want no

repetitive and no abrupt and no extreme neck motion. That's rotation, flexion, or extension, and so by extreme I mean more than 75% of the normal ranges of motion in any direction. So if the individual needs to turn their gaze more than 75% then they need to reposition their entire body.

Because of the neck motion, I don't want any overhead work, so I don't want her reaching and looking overhead. This individual should not work in hazardous environments. Even though she drives at last occasionally, I don't want her driving or operative moving machinery at work. I don't want her working unprotected heights, around exposed flames, around unguarded large bodies of water. Nor do I want her to have concentrated exposure to unguarded hazardous machinery. By that, I mean something more potentially dangerous than a conveyor belt. The individual I described can work around a conveyor belt, but I don't want them operating a punch press or working around large robotic machinery.

The individual is limited to simple routine tasks; jobs that involve only simple decision making; jobs that expose her to only occasional or minor changes in the work setting; and jobs that require the exercise of only simple judgment. This individual's better dealing with the concrete rather than the abstract, and better dealing with things rather than people. Speaking of people, I don't want this individual doing direct public service work, either in person or over the phone. They could tolerate brief and superficial interaction with the public, which is incidental to their primary job duties, but I don't want them working in crowded, hectic environments such as carnivals, street fair or something of that sort. This individual is capable of brief and superficial interaction with co-workers and supervisors as is common in unskilled work, but I don't want them doing two-person team or tandem tasks, such as a two-person lift where each individual's job performance is immediately and directly dependent upon the team member's job performance.

[10-2] at 3–5.

The VE testified that an individual with these limitations could not perform Plaintiff's past work (which the VE likened to an aide, a skilled occupation with an SVP level of 6 and an exertional level of medium according to the DOT but with a heavy exertional level as performed, *id.* at 2) because of the exertional level. *Id.* at 5.

But the VE testified that the hypothetical individual could perform other jobs existing in significant numbers in the national economy, including a marker and an office helper. *Id.* at 6. Even if the hypothetical person were limited to sedentary worker, the VE testified, she could still perform other jobs, including a document preparer and a final assembler. *Id.* On questioning from Plaintiff's attorney, the VE conceded that she knew of no occupation that would allow an employee to lie down at her workstation. *Id.* at 15.

At the conclusion of the hearing, the ALJ allowed the record to remain open so that Plaintiff could submit additional information responsive to the ALJ's stated concerns about the paucity of evidence to support Plaintiff's testimony concerning the nature and extent of her limitations. [10-2] at 16.

The ALJ issued his decision on December 9, 2016, finding that Plaintiff was not disabled. [10-1] at 34–47. In particular, the ALJ determine that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2019; she had not engaged in substantial gainful activity since May 1, 2013; she has the severe impairments of a circulatory impairment resulting in arterial congestion and aneurysms, as well as fibromuscular dysplasia; and her impairments do not meet or equal a listed impairment. [10-1] at 36–37. The ALJ determined that Plaintiff had the RFC to lift an/or carry up to 20 pounds occasionally and 10 pounds frequently, had no limitations in the total amount of time she can sit, stand, or walk throughout an 8-hour workday, but needed to be able to "alternate her position between sitting, standing, and walking for no more than five minutes out of every half hour." *Id.* at

37. The ALJ's "half hour" restriction apparently constituted a typographical error, as the ALJ indicated at the hearing that he intended to include in the RFC position changes for no more than 5 minutes every *hour*, not every half hour. He also included numerous other restrictions and limitations in his RFC. Nevertheless, based upon this RFC, the ALJ determined that Plaintiff was unable to perform any past relevant work. *Id.* at 41. He determined, at Step 5, however, that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other jobs existing in significant numbers in the national economy. *Id.* at 41–42.

Plaintiff requested review of the ALJ's decision, and, on December 15, 2017, the Appeals Council denied review, [10-1] at 7–9, making the ALJ's decision the final agency decision. Plaintiff then filed suit in this court, *see Abiodun A. v. Berryhill*, Case No. 18-cv-00842 (N.D. Ill.), [1]. Shortly after Plaintiff filed suit, the Commissioner filed an agreed motion for remand, *id.* at [21]. In particular, the parties agreed that, on remand, the ALJ would re-evaluate Plaintiff's RFC, explain the basis for any limitations, and solicit vocational expert testimony, if necessary, to determine whether Plaintiff could adjust to other work. *Id.*

On remand, ALJ Studzinski held a second hearing on August 13, 2019. Plaintiff again appeared, represented by counsel. At the outset of the hearing, Plaintiff's attorney indicated that Plaintiff's claimed severe impairments consisted of her circulatory impairment resulting in arterial congestion and aneurysms, and her fibromuscular dysplasia, which resulted in severe headaches; counsel conceded that Plaintiff's severe impairments did not meet or equal a listed impairment. [10-8] at

74–75. Plaintiff then testified concerning her limitations and symptoms: she testified that she has to lay down flat four hours a day because of her headaches, *id.* at 80, though she conceded that no doctor ever indicated that she complained of this condition or opined that laying down would be beneficial, *id.* at 81. Plaintiff testified that she lays down for about 10 hours in every 24-hour period (about six hours in bed at night and another four laying down because of her headaches); she testified that the rest of the time she sits in a chair. *Id.* at 98. She also testified that, since 2017, she has experienced pain and numbness in her fingers, and her legs do not work the way they should. *Id.* at 85. She testified that she cannot see in the dark, falls down a lot and is always tired, *id.* at 86; she testified that her doctors have told her that, to avoid a stroke, she should avoid stress, make sure her blood pressure is stable and not too high, and use her medication properly, *id.* at 87. When asked what kinds of things cause her stress, she identified loud environments, congested roads, being around yelling and screaming. *Id.* at 87–88. She testified that she experiences weakness in her hands and arms and can carry maybe only about 10 pounds, *id.* at 90; she testified that the doctors told her not to over-exert, *id.* at 90–91.

Plaintiff testified that she experiences side effects from her medication: fatigue, swollen feet and knees; she testified that she can be on her feet about 10/20 minutes before she has to sit down. *Id.* at 91–92. As before, the ALJ expressed skepticism about Plaintiff's allegations and attempted to elicit support in the record for Plaintiff's testimony; as before, Plaintiff's counsel conceded that nothing in the

7

record indicated that the doctors tied any fatigue or swelling to her medication or ever attempted to tweak her medications to address these complaints. *Id.* at 95.

Once again, the ALJ gave a detailed hypothetical to the VE, asking her to consider:

> an individual of the claimant's age, education, and work experience who's capable of light-level work as defined by the regulations. They can lift up to 20 pounds occasionally/10 pounds frequently; there are no limits in their total ability to sit, stand, and walk throughout an eight-hour workday; this individual needs to alternate between sitting and standing for at least five minutes out of every hours – that's out of every 60-minute period they must alternate their [position] for 5 minutes. Phrased another way, they can be on their feet standing and walking for 60 minutes after which they need to sit for 5 minutes before standing and walking for another hour. The opposite is true, they can sit for 60 minutes after which they need to stand and walk for up to 5 minutes before sitting for another 60 minutes. If they are to alternate their position more frequently during every hour for short periods totaling five minutes, then no discrete five-minute period at the end of each hour is needed.

> The individual would not, I repeat would not need to be off task while alternating positions. So, I'm looking for positions that either allow flexibility between sitting and standing at the workstation, perhaps a bench or assembly line where the individual generally stands, but . . . they can sit occasionally or perhaps a sedentary job as a – doing a lot of typing or computer work, but every hour they can get up and walk across the office for five minutes to do some copying.

> This individual should never climb ladders, ropes, and scaffolds and should no more than occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; this individual ought to perform no repetitive abrupt or extreme neck rotation, flexion, or extension. . . . By extreme, I mean more than 75 percent of the normal range of motion in all directions. So, for example, if she wants to rotate her neck more than 75 percent of the normal range of motion to the left or right, she has to reposition her entire upper body, her entire trunk, or reposition her feet to look to such extremes.

> And by abrupt and repetitive, I guess I'm talking about someone who's looking at watching a tennis match, just constantly looking back and

forth or even abrupt would be perhaps a need to do shoulder checks while driving in heavy traffic where you have to very quickly do a shoulder check to see traffic behind.

This individual should never [reach] overhead with either upper extremity; she should avoid concentrated exposure to excessive noise or light of a level which exceeds office-type environments; she should not work in hazardous environments. I don't want her driving, operating moving machinery, working at unprotected heights or working where she would have concentrated exposure to unguarded hazardous machinery.

This individual is limited to simple, routine tasks; she's limited to jobs that involve no more than simple decision making; she can choose amongst a limited number of anticipated options but is not to be expected to come up with creative solutions to novel situations. I don't want jobs that require considerable multitasking. She should be able to attend to the one task or task before her and complete that before moving on to another task. She's limited to work with no more than occasional and minor changes in the work setting in terms of workplace, work processes, and work products. I want jobs where she has a pretty good expectation of what's going to be expected of her when she reports to work each day and I'd like those expectations to remain largely unchanged during the course of an average daily tour of duty. She's limited to jobs that involve no more than simple judgment. She's better dealing with the concrete rather than the abstract and better dealing with things rather than people. she's limited – she can perform work which requires an average production pace, but not work which involves a significantly above average or highly variable production pace.

This individual ought not to do work which requires a great degree of self-direction. It was simple and routine. Once she completes one task, I'd like the next task to be obvious either because it is delivered to her workstation or because she has a simple set of instructions that she can refer to.

She is capable of work which involves – I don't want her dealing direct public service work either in person or over the phone. She is, however, capable of brief and superficial interaction with the public which is incidental to her primary job duties. I don't want her working in crowded or hectic environments such as carnivals or street fairs. She is capable of brief and superficial interaction with coworkers and supervisors as is common in unskilled work, but I don't want her doing team work or tandem tasks.

[10-9] at 1–5. The ALJ asked the VE whether light level jobs existed that this individual could perform, and the VE answered yes, offering representative examples including marker and garment sorter. *Id.* at 5. On questioning from Plaintiff's attorney, the VE testified that the jobs she identified typically would require a person to stand for about six hours and allow for a sit/stand option such that a person could sit down as needed. *Id.* at 6.

The ALJ then asked the VE to consider a hypothetical person with all of the above limitations and an additional visual limitation such that:

> they are not to perform prolonged precision near or far acuity so the individual can see well enough to drive, they can read, but they should not do jobs that require prolonged shall I say – well, use of a computer screen, reading fine print, or far acuity as I guess maybe some security guards who have to scan either – either watching televisions screens to see abnormalities or scanning parking lots to see whether anything's happening at a distance or the precision near acuity would be to discern very fine minute differences in an item. If they were inspecting they could certainly see – and I'll just say relatively large imperfections or color differences, but they could not see precise differences.

*Id.* at 9. The VE indicated that this person could still perform the jobs previously identified. *Id.*

The ALJ issued a second unfavorable decision on October 11, 2019, *see* [10-8] at 49–63. The ALJ, once again applying the five-step sequential analysis, determined that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2019; that she had not engaged in substantial gainful activity since May 1, 2013; that she has the severe impairment of circulatory impairment with fibromuscular dysplasia; and that her impairments do not meet or equal a listed

impairment. [10-8] at 52–54. The ALJ determined that Plaintiff had the RFC to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, had no limitations in the total amount of time she can sit, stand, or walk throughout an 8-hour workday, but needed to be able to "alternate her position between sitting, standing, and walking for no more than five minutes out of every hour," though without being off task. *Id.* at 55. The ALJ further determined that Plaintiff could:

> occasionally climb ramps and stairs, and she can occasionally stoop, kneel, balance, crouch and crawl, but she can never climb ladders, ropes or scaffolds. She is not capable of repetitive, abrupt, or extreme (more than 75% normal range of motion) neck flexion, extension, or rotation. She is not capable of working overhead. She ought not be exposed to light or noise which exceeds that encountered in office-type environments. She ought not perform work which requires prolonged or precise near or far visual acuity. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She is not to perform work which requires considerable multitasking or self-direction. She is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public which is incidental to her primary job duties. She is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers but is not to engage in tandem tasks.

*Id.* In making his RFC findings, the ALJ emphasized, as he had at both hearings, the lack of objective medical evidence to support the nature and severity of the symptoms Plaintiff claimed to suffer, explaining in detail his reasons for rejecting

Plaintiff's allegations and identifying the inconsistencies in what Plaintiff claimed at the hearing and what she reported contemporaneously in treatment. *Id.* at 55–61.

At Step 4, the ALJ determined, based upon the above RFC, that Plaintiff was unable to perform any past relevant work. *Id.* at 61. He determined, at Step 5, however, that, considering her age, education, work experience, and RFC, she could perform other jobs existing in significant numbers in the national economy. *Id.* at 62. As a result, he found her not disabled and denied her claim for benefits. *Id.* at 63.

Plaintiff again sought review in this Court. *See* [1]. Plaintiff urges reversal (or, alternatively, remand) because: (1) the ALJ improperly evaluated her RFC and failed to explain the bases for numerous limitations contained in the RFC assessment; (2) the ALJ's symptom evaluation is not supported by substantial evidence; and (3) the ALJ failed to meet his burden at Step 5 because the evidence showed that Plaintiff could only perform other work with accommodations. *See* [15]. The Commissioner, in response, argues that the ALJ properly evaluated Plaintiff's RFC and symptoms based upon the entire record and properly relied upon the VE's testimony. *See* [21]. The Commissioner thus asks the Court to affirm the ALJ's decision that Plaintiff is not disabled and not entitled to DIB. *See* [20].

## II.  <u>Legal Standard</u>

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v.*

*Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, after a "critical review of the evidence," *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993), the Court affirms any adequately supported denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), remanding only if the decision lacks evidentiary support or adequate discussion of the issues, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920, requiring the Commissioner to consider whether: (1) the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity to perform ("RFC") her past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy, *id.*; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

III.   **Discussion & Analysis**

Plaintiff argues that the ALJ improperly evaluated her RFC and failed to explain the bases for numerous limitations contained therein. Relatedly, she also argues that the ALJ's findings concerning her claimed symptoms are not supported by substantial evidence. Finally, she claims that the ALJ failed to meet his burden at Step 5 by relying on the VE's testimony, which improperly considered accommodations and conflicted with the DOT. The Court considers her arguments below.

A.   **The ALJ's RFC Findings**

The RFC is the maximum that a claimant can still do despite her mental and physical limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96–8p. It is based upon the medical evidence in the record and other evidence, including the claimant's testimony. 20 C.F.R. § 404.1545(a)(3). The ALJ is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding. *Id.* § 404.1527(d), (f). When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." *Id.* § 404.1545(a)(2), (b), (c).

The ALJ determined that Plaintiff had the RFC to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, had no limitations in the total amount of time she can sit, stand, or walk throughout an 8-hour workday, but needed to be able to "alternate her position between sitting, standing, and walking for no more

than five minutes out of every hour," though without being off task. *Id.* at 55. The

ALJ further determined that Plaintiff could:

> occasionally climb ramps and stairs, and she can occasionally stoop,
> kneel, balance, crouch and crawl, but she can never climb ladders, ropes
> or scaffolds. She is not capable of repetitive, abrupt, or extreme (more
> than 75% normal range of motion) neck flexion, extension, or rotation.
> She is not capable of working overhead. She ought not be exposed to
> light or noise which exceeds that encountered in office-type
> environments. She ought not perform work which requires prolonged or
> precise near or far visual acuity. The claimant is limited to working in
> non-hazardous environments, i.e., no driving at work, operating moving
> machinery, working at unprotected heights or around exposed flames
> and unguarded large bodies of water, and she should avoid concentrated
> exposure to unguarded hazardous machinery. The claimant is further
> limited to simple, routine tasks, work involving no more than simple
> decision-making, no more than occasional and minor changes in the
> work setting, and work requiring the exercise of only simple judgment.
> She is not to perform work which requires considerable multitasking or
> self-direction. She is further precluded from work involving direct
> public service, in person or over the phone, although the claimant can
> tolerate brief and superficial interaction with the public which is
> incidental to her primary job duties. She is unable to work in crowded,
> hectic environments. The claimant can tolerate brief and superficial
> interaction with supervisors and co-workers but is not to engage in
> tandem tasks.

*Id.*

Plaintiff argues that the ALJ failed to explain the basis for numerous

limitations in the RFC, [15] at 5. In particular, she argues that the ALJ did not

explain his finding that Plaintiff had no restrictions on how much time she could

stand and walk so long as she could shift positions for no more than 5 minutes in each

hour; nor did he explain his finding that she would not be off task while changing

positions, *id.* at 5–10. Plaintiff also argues that the ALJ failed to explain the bases

for his environmental limitations, including those relating to light and noise; and she

notes that to the extent the ALJ intended such limitations to address her headaches, nothing in the record suggested that such limitations worked to alleviate her pain or prevent her headaches. *Id.* at 12. Finally, Plaintiff generally faults the ALJ for discounting her allegations concerning the nature and severity of her symptoms, particularly in light of her good work record. *Id.* at 12–16.

In determining Plaintiff's RFC, the ALJ complied with the SSA's two-step process, including considering Plaintiff's statements about the intensity and limiting effects of her symptoms. 20 C.F.R. § 404.1529. When the Plaintiff's statements are not supported by the objective medical evidence, the ALJ must consider other evidence in the record to determine if Plaintiff's symptoms limit her ability to do work-related activities. § 404.1529(a). The ALJ did so here. The ALJ compared Plaintiff's testimony that her impairments compelled her to lay down for four hours every day to all of the medical evidence and Plaintiff's other statements (some made to the ALJ, some made to Plaintiff's doctors) and found the former to be incredible. Specifically, the ALJ found that Plaintiff's testimony about her frequent debilitating headaches and her need to lie down found no support in the medical records. [10-8] at 56. The ALJ noted that Plaintiff made two emergency room visits in 2013 after the alleged onset date, only one of which was for a headache; she went to the ER on September 2, 2013 because "she felt 'jittery' after taking some medication" and went again on November 19 for a headache and face pain, which she feared might indicate another carotid artery dissection. *Id.* The ALJ further noted that, on that headache-related ER visit, tests "revealed that the previously seen left and right internal

16

carotid artery conditions were stable and had not changed since prior studies." *Id.* The ALJ noted that testing at the Cleveland Clinic in 2014 confirmed that her carotid artery dissection had resolved. *Id.* The ALJ also noted Plaintiff's self-report to her primary care physician on May 15, 2013 that she "no longer has headaches," as well as her failure to mention headaches at her visit on June 6, 2014. *Id.* at 56–57.

The ALJ noted additional evidence documenting headaches much less frequently than Plaintiff claimed: in addition to the November 2013 ER visit, Plaintiff complained of headaches to Dr. Khan in September of 2013 and October of 2015 and went to the ER for headaches in January and September of 2015. *Id.* at 57. She denied headaches at a visit with Dr. Khan in January 2016. *Id.*

The ALJ further noted that, although Plaintiff visited the ER for headaches, such visits were "sporadic," *id.* at 59, and "since the alleged onset date, none of them were related to arterial dissection," *id.* In fact, he noted, multiple imaging studies "demonstrated this condition was stable," to the point where her doctor at the Cleveland Clinic discontinued the medication she took to reduce blood clotting. *Id.* The ALJ noted that Plaintiff's medical history did not document extensive visits with her primary care physician; she saw him sporadically and went almost nine months without seeing him in 2015, two years after her alleged onset date, and without seeing him at all from May 2018 to May 2019. *Id.* at 57, 59. What's more, when she did see Dr. Khan, she "routinely denied headaches, made no mention of excessive fatigue, and had full motor strength." *Id.* at 59. On the occasions when she did complain about headaches or pain, the ALJ noted, her doctor determined that those symptoms

stemmed from acute problems such as sinus infections, TM joint syndrome, or stress associated with her mother's death. *Id.* at 56–59. The ALJ explained that Plaintiff's self-reporting to her treaters contradicted her allegations concerning the nature and extent of her limitations, and he detailed numerous instances in the record to prove his point. Quite simply, the ALJ had reviewed the materials in advance and simply could not find anything to corroborate her testimony.

Although Plaintiff claims that the ALJ failed to articulate a basis for the limitations he did include, that simply is not true. The ALJ noted from the outset that he found Plaintiff suffers from severe impairments; he just expressed skepticism about the severity of her claimed symptoms. He never doubted that she experienced headaches, and he explained that he included limitations designed to address her allegations about what triggered those headaches. She testified that her doctors told her to avoid stress to prevent headaches, and she testified that loud environments, congested roads, and being around yelling and screaming all caused stress. [10-8] at 87–88. The ALJ included limitations to address these stressors, and he built a logical bridge from the evidence to his findings.

The ALJ's RFC limitations also find support in the consultative examination reports prepared by Dr. Charles Kenney on May 14, 2014 and by Dr. Prasad Kareti on December 11, 2014. On initial review, Dr. Kenney determined that, although Plaintiff's impairments could reasonably be expected to produce her pain or other symptoms, her statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence.

18

[10-2] at 20.  And he found her statements about her symptoms to be only partially credible.  *Id.*  Dr. Kenney determined that Plaintiff did have exertional limitations: she could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, sit for about six hours in an eight-hour workday (with normal breaks), and stand and/or walk about six hours in an eight-hour workday (with normal breaks).  *Id.* at 21.  Dr. Kenney observed that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  *Id.* He opined that she demonstrated an inability to perform anything greater than light exertional work.  *Id.* at 22.

At the reconsideration level, Dr. Kareti again determined that Plaintiff's impairments reasonably could be expected to produce her pain or other symptoms, but that her statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence.  Dr. Kareti also found Plaintiff to be only partially credible.  *Id.* at 29.  In this regard, Dr. Kareti indicated that Plaintiff's allegation that she had difficulty walking was not supported by credible medical findings.  *Id.*  Dr. Kareti found Plaintiff to have the same exertional limitations as Dr. Kenney had found, *id.* at 30, and also determined that Plaintiff should be limited to light exertional work, *id.* at 31.  Both doctors found Plaintiff not disabled.  *Id.* at 23, 31.  Upon careful review, the ALJ gave these opinions great weight. [10-8] at 60.

Although Dr. Kenney and Dr. Kareti did not include any limitations about how frequently Plaintiff would need to shift positions, the ALJ's decision to include this additional limitation inures to Plaintiff's benefit, as it establishes an RFC that is even

19

more flexible.  If, as the consultative examiners determined, Plaintiff could sit for six hours, and also stand or walk for six hours,[2] she was effectively unlimited in her ability to sit/stand/walk in any eight-hour period as long as she could shift positions. The evidence supports the ALJ's findings, and any error in failing to articulate the exact basis for the five minute per hour shift would be harmless.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding an ALJ's error is harmless if remand on that basis "would not affect the outcome of this case.").

Plaintiff wonders why the ALJ chose to include a shift of five minutes every hour, and not ten or twenty minutes every hour.  But the record does not support lengthier positional shifts and does not suggest that Plaintiff would be slow to change position or have any difficulty doing so.  Nor does the record provide any basis to conclude that the positional shifts would take Plaintiff off task.  In fact, as the ALJ explained, Plaintiff established "no more than mild limitations" in concentrating, persisting, or maintaining pace.  [10-8] at 5.  And any such limitations are accommodated in the ALJ's RFC.  Contrary to Plaintiff's claim, the ALJ did include a narrative discussion in his decision as required by SSR 96-8p; he stated:

> Although the evidence is not consistent with the claimant's allegations regarding the severity and frequency of headaches, I have given her the benefit of the doubt in including limitations intended to prevent exacerbation of any headaches the claimant may experience. These include no exposure to light or noise, which exceeds that encountered in an office-type environment, and she should not perform work which requires prolonged or precise near or far visual acuity. She is limited to work in non-hazardous environments, as in no driving at work or

---

[2] Plaintiff argues that the consultative examiners found that Plaintiff could only collectively sit, stand, and walk for six hours daily.[24] at 4.  But that is not accurate: they found that she could sit for six hours in an eight-hour workday, *and* she could also stand and/or walk for six hours in an eight-hour workday.

> operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water. She should avoid concentrated exposure to unguarded hazardous machinery. Additionally, she testified activities like being in stressful situations, being around people, and driving in congested areas exacerbate her headaches. I have therefore included additional limitations, such as simple, routine tasks, with work involving no more than simple decision making. She can tolerate no more than occasional and minor changes in the work setting, with work involving no more than the exercise of simple judgment. She should not perform work requiring considerable multitasking or self-direction. She should not do work involving direct public service, in person or over the phone, although she can tolerate brief and superficial interaction with the public which is incidental to her primary job duties. She should not work in crowded, hectic environments, but can tolerate brief and superficial interaction with supervisors and coworkers. She should not engage in tandem tasks. These limitations address her testimony regarding stress as a trigger for headaches, which she also mentioned to Dr. Khan. Ex. 7F/10.

[10-8] at 60. And the narrative discussion concerning her physical limitations also included a review of her medical records and an explanation of the inconsistencies between those records and her allegations. The ALJ satisfied SSR 96-8p.

Similarly, even though Plaintiff claims the record does not support the ALJ's finding that she had no limitations in the total amount of time she is able to sit, stand or walk throughout at eight-hour workday, that claim is again inaccurate. Plaintiff testified that she lied down 10 hours a day, including 6 hours at night, and then sat in a chair the rest of the time, suggesting that she could sit for at least six hours every day. [10-8] at 98. By her own admission, she had no difficulty sitting. She also consistently reported running and jogging, further supporting the ALJ's finding. The ALJ noted all of this in his narrative discussion. Based upon the consultative examiners' findings, the postural change limitation effectively rendered her unlimited in her ability to sit or stand/walk in any eight-hour period. Reading the

ALJ's decision as a whole and giving it a "commonsensical reading rather than nitpicking at it," this Court finds that the ALJ provided a rational articulation of the grounds of his decision with respect to Plaintiff's ability to sit and stand/walk. *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir. 1999) ("When a claimant argues that there are fatal gaps or contradictions in the administrative law judge's opinion, thus appealing to the important principle of administrative law that the agency provide a rational articulation of the grounds of its decision, we give the opinion a commonsensical reading rather than nitpicking at it.") (citations omitted).

Plaintiff emphasizes that the ALJ's RFC fails to consider her need to lie down for four hours every day. While true, the ALJ made it clear that he deliberately declined to include this limitation because he did not believe it. Indeed, when the ALJ expressed skepticism about her allegation at the hearing, counsel conceded that no doctor ever noted her complaint about having to lie down for four hours a day or recommended this course of treatment to her. [10-8] at 81. This Court gives special deference to an ALJ's credibility findings, overturning them only if "patently wrong." *Summers v. Berryhill,* 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue,* 534 F.3d 663, 667–68 (7th Cir. 2008)); *see also Matthews v. Saul,* 833 F. App'x 432, 437 (7th Cir. 2020) (finding even where the Commissioner conceded the record could be read differently, the ALJ's partially adverse credibility finding was not "patently wrong" and "substantial evidence" supported his conclusion that the plaintiff's complaints "were not entirely consistent with the record."). A decision is "patently wrong" when it lacks any explanation or support. *Elder,* 529 F.3d at 413–14. That is

not the case here; on the contrary, the ALJ adequately explained his reasons for discounting Plaintiff's testimony about her symptoms and limitations, including her allegation concerning her need to lie down, and the Court will not second guess those findings.

### B. **The ALJ's Step 5 Findings**

In deciding whether Plaintiff established disability, the ALJ applied the standard five-step inquiry, *see* 20 C.F.R. § 404.1520, which required him to evaluate, "in sequence: (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is capable of performing work in the national economy," *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). In this sequential evaluation process, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled," and a "negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (citing *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)). If a claimant "reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy." *Id.* Additionally, where a non-exertional limitation might substantially reduce a range of work that an individual can perform, the ALJ must consult a vocational

expert in an effort to determine whether there are a significant number of jobs in the national economy that she can do given her physical and mental impairments. *Zurawski*, 245 F.3d at 889 (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

Consistent with these standards, the ALJ consulted a vocational expert here. Plaintiff argues, however, that in testifying that Plaintiff could perform the garment sorter job, the VE inappropriately considered the use of a stool to fulfill the sit/stand option mandated by the ALJ in his hypothetical, which would constitute an accommodation as a stool is not normally provided.

To be sure, accommodations are not considered when assessing work at Step 5. *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999) ("when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account"); *Wojciech B. v. Saul*, No. 19 CV 362, 2020 WL 3960997, at *10 (N.D. Ill. July 13, 2020) ("it would have been inappropriate for the VE to inject, or the ALJ to consider, assumptions about employer accommodations into testimony or the decision."); *Singleton v. Berryhill*, No. 3:17-CV-00576-MGG, 2018 WL 4579711, at *3 (N.D. Ind. Sept. 25, 2018) ("in making a determination of whether an individual is disabled for Social Security Disability Insurance ('SSDI') purposes, the SSA is not to take the possibility of "reasonable accommodation" into account."); *see also* SSR 11-2p, 2011 WL 4055665, at *9 (Sept. 12, 2011) ("When we determine whether a person can do other work that exists in significant numbers in the national economy, we do not consider whether he or she could do so with accommodations, even if an employer would be required to

provide reasonable accommodations under the Americans with Disabilities Act of 1990.").  But the record shows that the VE did not consider an accommodation.

The ALJ asked the VE whether, given the detailed limitations posed in his hypothetical, there were any light level jobs that the hypothetical individual could perform, and the VE said there were and she provided two representative examples: "Yes, Your Honor. One example would be a marker; DOT code 209.587-024; SVP 2; light exertion; estimated jobs nationally, 2,046,000.  Next example, garment sorter; DOT 222.687-014; SVP of 2; light exertion; estimated jobs, 256,000."  [10-9] at 5.

In response to questions from Plaintiff's counsel, the VE testified that the jobs she identified "allow for a sit/stand option. A person would be able to sit down as needed.  *Id.* at 6.  Counsel drilled down on the point:

> Q      Okay. I'm just interested, would there be tasks within each job that would require one to sit as opposed to stand or stand as opposed to sit?
> A      These jobs – these particular jobs can be done either sitting or standing.
> Q      Because I guess I'm just looking at the garment sorter position which you gave which described by the DOT … notes that sorts finished garments such as shirts, dresses, and pajamas according to lot and size numbers recorded on tags and labels attached to garments; may fold and package garments in boxes and bags; may iron garments … prior to folding. So is it your testimony that all of those tasks could be done sitting?
> A      Yes, counsel, all of those jobs could be done sitting, but I look for jobs that have a sit/stand option where a person needs to do something standing up, they can do so.  They don't have to remain standing for six hours out of an eight-hour workday, however.
> Q      So they would have an iron set up where it could be both raised and lowered? Is that how it would work?
> A      On a board to iron, you can generally reach this by having a stool where you could iron the garment.

25

Q    So the stool would be what they were sitting on at all times in the job or would it have to be brought in special if they wanted to sit while ironing?

A    A stool would not typically be provided. This is only for these jobs. That would be an accommodation where it could be provided.

Q    But it was just your testimony that a stool would be used to iron if they needed to sit during ironing, is that correct?

A    Yes, a stool would be used. They could iron. An individual would iron using a stool.

Q    So if I'm understanding your testimony, if the individual had to iron during the five minutes of the hour that they wanted to sit, that would be called an accommodation?

A    Yes, counsel, if a stool was not already in the workplace, that would be considered an accommodation.

Q    Well. That's – I'm a little confused by your testimony because are we calling this accommodated work or are we not?

A    Counsel, I'm saying a stool would not necessarily be a typical part of the environment, but for this job, an individual would be able to sit or stand if the stool was not provided. Normally, one could be provided. The person could still do the job without being off task.

Q    So that conflicts with your testimony that it's an accommodation then. That's why I'm concerned.

A    The stool is not normally provided. I would call it an accommodation if it was requested and then provided.

*Id.* at 6–8. Reading the transcript in its entirety, Plaintiff is simply wrong. The VE did not testify that Plaintiff could perform the garment sorter job only with the accommodation of the stool; she testified that Plaintiff could perform the job because it provided a sit/stand option (with or without a stool) and would allow her to shift positions between sitting and standing without being off task.

Plaintiff also argues that the VE's testimony demonstrated a conflict as to whether the jobs she identified for Plaintiff involved detailed instructions: counsel indicated that the DOT said they did, but the VE testified that they did not. The ALJ in his decision found that, notwithstanding counsel's argument about detailed instructions (raised at the hearing as well as in the instant appeal), the VE "identified

26

more than two millions jobs within the national economy that fit within the limitations set forth in [his] hypothetical, and she satisfactorily explained her reasoning that the jobs of marker and garment sorter involve no more than simple, routine tasks." [10-8] at 63. The record bears this out.

The hearing transcripts show that counsel and the VE were talking past each other a bit on this issue, with counsel suggesting that "detailed instructions" were inconsistent with "simple tasks" and the VE focusing on the unskilled nature of the jobs and the fact that a reasoning level 2 is "very low." Recognizing that counsel was attempting to establish a conflict between the VE's testimony and the DOT, the ALJ addressed the issue directly:

> Q      he's investigating whether there is a conflict between your testimony and the DOT. I'm not persuaded that this is a terribly persuasive line of inquiry, but we do need to just address it. Is your description of these jobs as satisfying my hypothetical, what is that based on, ma'am? Is that based on your review of the DOT or are you familiar with these jobs? Have you encountered these jobs personally?
> A      Yes, Your Honor, it's based on both of these. I have encountered the jobs personally and it is based on the DOT description, reasoning level 2 is very low. The only lower is a level 1 and I could give you level 1 jobs if that would be more satisfactory, but level 2 is – is a very low level.
> Q      And are you aware of anywhere –
> A      These are unskilled jobs.
> Q      -- in the DOT where they do define what a detailed instruction is?
> A      No, Your Honor.
> Q      Okay.
> ALJ: Mr. Arnold, are you aware of that sir?
> ATTY: Let me check. I don't know that it was prescribed specifically in the DOT.

*Id.* at 11–12. After a somewhat contentious exchange between the ALJ and Plaintiff's counsel, the ALJ asked the VE whether "any aspect of her testimony conflicted with

the Dictionary of Occupational Titles"; she responded: "Not conflicted, Your Honor, but there are things that are not considered and I have answered based on my experience – the sit/stand option also flexibility or neck rotation, overhead reaching – these are not covered by the DOT and also I've used my judgment when it comes to – the visual ability these are – this is – the positions I gave are not jobs that require inspection or very fine visual detail." *Id.* at 16.

Based upon the record, this Court cannot say that the ALJ's reliance on the VE's testimony rendered his findings unreliable. The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT. Based upon the regulations, "unskilled work" means "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568, 416.968. The regulations do not support Plaintiff's suggestion that SVP 2 involves following or processing detailed instructions.

The DOT descriptions for the jobs identified by the VE also do not support

Plaintiff's position. The DOT describes the marker position as follows:

> CODE: 209.587-034
> TITLE(s): MARKER (retail trade; wholesale tr.) alternate titles:
> marking clerk; merchandise
> Marks and attaches price tickets to articles of merchandise to record
> price and identifying information: Marks selling price by hand on boxes
> containing merchandise, or on price tickets. Ties, glues, sews, or staples
> price ticket to each article. Presses lever or plunger of mechanism that
> pins, pastes, ties, or staples ticket to article. May record number and
> types of articles marked and pack them in boxes. May compare printed
> price tickets with entries on purchase order to verify accuracy and notify
> supervisor of discrepancies. May print information on tickets, using
> ticket-printing machine [TICKETER (any industry); TICKET PRINTER
> AND TAGGER (garment)].
> GOE: 05.09.03 STRENGTH: L GED: R2 M1 L1 SVP: 2 DLU: 77

And it describes the garment sorter position as:

> CODE: 222.687-014
> TITLE(s): GARMENT SORTER (garment)
> Sorts finished garments, such as shirts, dresses, and pajamas, according
> to lot and size numbers recorded on tags and labels attached to
> garments. May fold and package garments in boxes and bags. May iron
> garments prior to folding [PRESSER, HAND (any industry)]. May be
> designated according to garment sorted as Shirt Sorter (garment).
> GOE: 06.03.02 STRENGTH: L GED: R2 M2 L1 SVP: 2 DLU: 77

To the extent Plaintiff argues that the General Education Development (GED)

ratings for this job conflict with the ALJ's hypothetical or RFC, the Court disagrees.

The R2 (02 level reasoning development) listed in the DOT's job description indicates

that the position requires the worker to "apply commonsense understanding to carry

out detailed but uninvolved written or oral instructions. Deal with problems involving

a few concrete variables in or from standardized situations."  In contrast R1 (01 level

reasoning development) means the job requires the worker to "apply commonsense

understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." But the ALJ's hypothetical to the VE did not limit Plaintiff to simple one- or two-step instructions; instead it provided as follows with respect to reasoning,

> This individual is limited to simple, routine tasks; she's limited to jobs that involve no more than simple decision making; she can choose amongst a limited number of anticipated options but is not to be expected to come up with creative solutions to novel situations. I don't want jobs that require considerable multitasking. She should be able to attend to the one task or task before her and complete that before moving on to another task. She's limited to work with no more than occasional and minor changes in the work setting in terms of workplace, work processes, and work products. I want jobs where she has a pretty good expectation of what's going to be expected of her when she reports to work each day and I'd like those expectations to remain largely unchanged during the course of an average daily tour of duty. She's limited to jobs that involve no more than simple judgment. She's better dealing with the concrete rather than the abstract and better dealing with things rather than people. she's limited – she can perform work which requires an average production pace, but not work which involves a significantly above average or highly variable production pace.

> This individual ought not to do work which requires a great degree of self-direction. It was simple and routine. Once she completes one task, I'd like the next task to be obvious either because it is delivered to her workstation or because she has a simple set of instructions that she can refer to.

[10-9] at 3–4. This hypothetical does not preclude the application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and is consistent with R2.

The Court rejects Plaintiff's argument concerning any alleged conflict in the VE's testimony and finds that the ALJ properly relied on such testimony in making

his Step 5 findings. Although it is true that a finding based upon unreliable VE testimony "is equivalent to a finding that is not supported by substantial evidence," *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018), the VE's testimony here was not unreliable; rather, it was based upon the DOT and the VE's own personal experience.

## IV. Conclusion

For the reasons explained above, this Court finds that the ALJ's decision rests upon substantial evidence in the record. Accordingly, the Court denies Plaintiff's motion seeking reversal, grants the Commissioner's motion for summary judgment [20], and affirms the Commissioner's decision to deny benefits.

Dated: June 10, 2022

Entered:

John Robert Blakey
United States District Judge